IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHOOM, INC., | No. C05-03434 MJJ |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| ELECTRONIC IMAGING SYSTEMS OF AMERICA, INC. ET AL, | |
| Defendant. | |

Pending before the Court is Defendant Electronic Imaging Systems of America, Inc.'s ("eISA") Motion to Dismiss Plaintiff Shoom, Inc.'s ("Shoom") First Amended Complaint for lack of subject matter jurisdiction. (Doc.# 27.) For the following reasons, the Court **GRANTS** eISA's motion.

I.  **Background**

On August 24, 2005, Shoom filed its original Complaint against eISA and eISA's CEO, John Metsig. (Doc. #1). In that Complaint, Shoom sought declaratory judgments of noninfringement and invalidation of U.S. Patent No. 6,505,173 (the '173 Patent), and asserted claims under California Business and Professions Code § 17200 and 35 U.S.C. § 292. eISA subsequently filed a motion to dismiss. In response, Shoom filed a First Amended Complaint. (Doc. #13.) Shoom's First Amended Complaint requests declaratory judgments of noninfringement and invalidity of the '173 patent; drops the false patent marking and unfair business practice claims; and no longer names Mr. Metsig as a defendant. eISA now moves to dismiss Shoom's First Amended Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

Shoom is in the business of producing electronic invoices containing electronic tearsheets for newspapers that publish print advertisements.[1] eISA owns the '173 Patent entitled "Method for electronically merging digitized data system of generating billing statements for published advertising." In June 2005, eISA sent a form letter regarding the '173 patent to approximately 250 newspapers and newspaper organizations. Approximately 30 of Shoom's customers received eISA's form letter. The letter states:

> Dear [addressee] :
>
> Electronic Imaging Systems of America, Inc. ("eISA") owns Wirbel et al., United States Patent 6,505,173 ("the '173 Patent"), which issued on 07 January 2003. For your convenience, I have enclosed a copy of the '173 Patent as it may concern existing and/or contemplated system decisions that may relate but may not be limited to: Electronic Tearsheets, Proof of Ad Delivery Systems, Advertising/Classified Statements and Inserts Orders/Contracts. eISA currently has another U.S. Patent Application pending before the United States Patent and Trademark Office, which is related to the technology covered by the '173 Patent."
>
> Although eISA currently owns all rights, title and interest in the '173 Patent, eISA intends to soon license, exclusively or not-exclusively, or otherwise transfer its rights, title and/or interest in the '173 Patent.
>
> I am communicating this letter to you and other companies in the industry. If you want to license or purchase rights associated with the '173 Patent, please contact me at your convenience.
>
> Thank you,
>
> John Metsig
> President and CEO

(Doc. # 29, Metsig Decl., ¶6, Ex. 2)

On July 27, 2005, Karen Spurlock of Gannet, a company that is one of Shoom's customers and owns approximately 1000 newspapers, informed William Freschi, C.E.O. of Shoom, about the eISA letter and sent Mr. Freschi an email with the '173 patent. In the email, Ms. Spurlock states, "Please . . . let me know what Shoom is doing about this. Newspapers across the country have begun receiving communications from [eISA] . . . . It's an obvious concern . . . . We have also contacted Gannet Legal and have them looking into it." In response, Mr. Freschi assured her that the '173 patent did not apply

---

[1] Newspaper companies provide their advertisers with invoices in order to account for money owed for publishing an advertisement. Typically, newspapers include clippings or tearsheets with these invoices as proof of publication.

United States District Court
For the Northern District of California

to the electronic invoices that Shoom provides to Gannet.

Concurrently, on July 27, 2005, Ed Kost, Chief Information Officer for the Tribune Review Publishing Company, also a Shoom customer, emailed Shoom. Mr. Kost's message references the eISA form letter. Additionally, Mr. Kost's email contains an email sent from Brad Koltz of the New Media Foundation to Mr. Kost. Mr. Koltz's message addresses research he did for Mr. Kost concerning the '173 patent. In this portion of the email, Mr. Koltz writes, "I'm not a patent attorney, but I'd sure check with one before doing much in this area."

The next day, on July 28, 2005, Mr. Freschi called Mr. Metsig regarding the form letter and the '173 patent. Mr. Freschi indicated that the form letters were causing great turmoil and uncertainty among Shoom and Shoom's customers. Mr. Freschi also mentioned that the market was "frozen in turmoil, customers [were] calling, prospects [were] postponing decisions," and that it was "urgent" for the parties to resolve the problem. Shoom also contends that Mr. Metsig said, "In general, the '173 patent covered the creation of any electronic invoice for a newspaper." However, Mr. Metsig does not recall making this statement, but acknowledges that he may have told Mr. Freschi that "the '173 patent related to electronic invoices in the publishing market."

On July 29th, Mr. Freschi again emailed Ms. Spurlock of Gannet in order to update her on the patent issue and to assure her that Shoom was diligently addressing the problem.

On the same day, Mr. Freschi emailed Mr. Metsig for further clarification of the scope of the '173 patent. Mr. Metsig sent a response email to Mr. Freschi, stating:

> Good Morning Bill,
>
> Just returned from Memphis/Little Rock...I think it is hotter here in Chicago today than there...and that's HOT!!
> Sorry for the misunderstanding regarding my visit to California...I will not be out there until later this month or September.
>
> Bill, I am not an intellectual property attorney and therefore cannot advise you legally or from a laymen's [sic] perspective on the advice of my attorney. The patent content is as it is in the document I sent you...and I say this with all respect to you.
>
> I would be happy to discuss this with you at your earliest convenience or if you are planning to come to Chicago before I go to your beautiful Coast, we can meet here. My intentions are to work with you if at all possible, so that we can better serve our clients and each other.
>
> Thanks,

john [sic]

(Doc.# 33, Freschi Decl., Ex. 6)

Mr. Freschi replied to Mr. Metsig's email, stating, "when you start a freeze on the market place . . . you impose a great urgency to resolve the situation immediately."

Subsequently, on August 1, 2005, Ms. Cole of the Toledo Blade newspaper emailed Ms. Ryoji of Shoom. Ms. Cole notified Shoom about the issue concerning the '173 patent and warned Shoom that a discussion concerning patent ownership rights of electronic tearsheets had emerged in the New Media mailing.

On August 4, 2005, Ms. Spurlock again emailed Mr. Freschi for an update on the situation. In response, Mr. Freschi reiterated that Shoom was taking steps to address her concern.

On August 11, 2005, John Kephart of Shoom sent an intra-office memo to Shoom's sales team. The memo mentioned that the Las Vegas Review Journal ("LVRJ"), which was a customer of Shoom, was considering a change in tearsheet providers. The memo explained that the LVRJ received the June 2005 form letter and believed that a potential patent violation may result with Shoom.

Mr. Freschi contends that Mr. Metsig made various other statements before Shoom filed its declaratory action against eISA. These statements include the following: "[t]he patent applies to everyone who creates electronic invoices for newspapers, you are going to pay"; "[y]ou can pay me now or pay me later"; and "[w]e will let the lawyers handle it." Mr. Metsig does not recall making these statements; however he claims that if he did, they occurred during settlement discussions after Shoom filed this lawsuit.

On August 24, 2005, Shoom filed this declaratory action. At some point, the partes engaged in discussions regarding royalty rates for licensing the '173 patent. According to Shoom, these discussions preceded its initiation of this lawsuit. eISA, however, alleges that any discussions occurred after Shoom filed its Complaint. eISA now moves to dismiss Shoom's First Amended Complaint on the basis that Shoom has failed to demonstrate that an actual controversy exists conferring subject matter jurisdiction on this Court under the Declaratory Judgment Act.

**II.    Legal Standard**

The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that "[i]n a case of actual controversy" a federal court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." This "actual controversy" requirement "is the same as the 'case or controversy requirement of Article III of the United States Constitution." *Societe de Conditionnement en Aluminium v. Hunter Engineering Co.,* 665 F.2d 938, 942 (9th Cir. 1981) (citing *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239-40 (1937)). "To constitute an actual controversy, the plaintiff has the burden of establishing by a preponderance of the evidence . . . that it has a reasonable apprehension that it will be sued." *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 887 (Fed. Cir. 1992) (citing *Jervis B. Webb Co. v. Southern Sys., Inc.*, 742 F.2d 1388, 1398 (Fed. Cir. 1984). In conducting this review, the Court "look[s] for any express charges of infringement, and if none, then to the totality of the circumstances." *Arrowhead Indus. Water Inc. v. Ecolochem Inc.* 846 F.2d 731, 736 (Fed. Cir. 1988).

In suits requesting a judicial declaration of patent invalidity or non-infringement, courts apply a two-part test to determine whether an actual controversy exists, thereby invoking the court's subject matter jurisdiction pursuant to the Declaratory Judgment Act. *See BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed. Cir. 1993). The plaintiff must show: "both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *Id.* "The test, however stated, is objective and is applied to the facts existing when the complaint is filed." *Arrowhead Indus. Water Inc.*, 846 F.2d at 736.

When considering a Rule 12(b)(1) motion challenging the substance of jurisdictional allegations, the Court is not restricted to the face of the pleadings, but may review any evidence, such as declarations and testimony, to resolve any factual disputes concerning the existence of jurisdiction. *See McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). The burden of proof on a Rule 12(b)(1) motion is on the party asserting jurisdiction. *See Sopack v. Northern Mountain Helicopter Serv.*, 52 F.3d 817, 818 (9th Cir. 1995). The principles articulated in *Data Disc, Inc. v. Systems Technology Assocs.*, 557 F.2d

5

1  1280, 1284-86 (9th Cir. 1977), regarding the evidentiary standard apply in determining personal
2  jurisdiction are also applicable to determination of subject matter jurisdiction. *Societe de*
3  *Conditionnement En Aluminium*, 655 F.2d at 942. Thus, when a defendant's motion to dismiss is made
4  as its initial response, Shoom need only make a *prima facie* showing that subject matter jurisdiction
5  exists. *Data Disc*, 557 F.2d at 1285.

6  If the pleadings and other submitted materials raise issues of credibility or disputed questions
7  of fact, the court may, in its discretion, order a preliminary hearing to resolve the contested issues. In
8  this situation, the plaintiff must establish the jurisdictional facts by a preponderance of the evidence.
9  *Id.* Likewise, where the jurisdictional facts are "intertwined with the merits of the action," it is
10 preferable that determination of jurisdiction be made at trial. *Id.* at 1285-86.[2]

11 In this instance, a *prima facie* showing means that Shoom has produced admissible evidence
12 which, if believed, would be sufficient to demonstrate a finding of an actual controversy to confer
13 subject matter jurisdiction under the Declaratory Judgement Act. *Id.*

14 **III.   Discussion**

15 As indicated above, Shoom has the burden of demonstrating facts creating a reasonable
16 apprehension of lawsuit. Shoom maintains that three factual characteristics of this case - (1) eISA's
17 June 2005 letter, (2) Mr. Metsig's August 1, 2005 email, and (3) Mr. Metsig's oral statements to Mr.
18 Freschi - illustrate that there existed a reasonable apprehension of a lawsuit under the totality of the
19 circumstances. The Court therefore reviews Shoom's proffered facts.

20 First, Shoom contends that eISA's June 2005 letter resulted in confusion and insecurity among
21 its customers about their use of Shoom's product and constituted an attempt by eISA to "solicit
22 [Shoom's] clients and its prospects in the marketplace." (Freschi Decl. at ¶27.) According to Shoom,
23 eISA's June 2005 letter "states in subtle lawyer language that the eISA patent covers electronic tear
24 sheet systems, the very essence of Shoom's longstanding business and a vital necessity for today's
25 newspapers." (Opp. at 12.) Shoom proffers that, after receiving the letter, its customers, including its
26 largest customer, Gannet Corporation, contacted Shoom to express their concern over receiving the

27
28  [2] In the instant case, the Court finds that an evidentiary hearing is unnecessary because the Court need not determine material facts to decide eISA's motion. Thus, Shoom need only present a *prima facie* case that an actual controversy exists permitting the Court to exercise its jurisdiction over Shoom's claim for declaratory relief.

6

1 letter. Additionally, Shoom contends that the letter resulted in another of its customer's, Tribune
2 Review Publishing Company, refusing to continue to work with Shoom on the implementation of an
3 electronic tearsheet service until the matter was resolved. (Doc. 33, Freschi Decl. at ¶ 36.) As Shoom
4 characterizes it, eISA's letter created major turmoil in the newspaper industry and "placed [Shoom] on
5 the defensive, threatened [Shoom's] position in the industry, and [] threaten[ed] [Shoom] with litigation
6 over a possible liability that [Shoom] [was] having a difficult time evaluating." (*Id.* at ¶ 33.)[3]

7 "The offer of a patent license does not create an actual controversy." *Phillips Plastics Corp. v.*
8 *Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051, 1053 (Fed. Cir. 1995). Here, eISA's June 24, letter sent
9 to hundreds of newspapers and newspaper organizations consisted of nothing more than a mere offer
10 to license. The letter specifically states that "eISA intends to soon license . . . its rights and/or interest
11 in the '173 patent . . . If you want to license or purchase rights contact me at your convenience."

12 Additionally, contrary to Shoom's characterization, the language of the letter is not threatening
13 to either Shoom or Shoom's customers. In *Shell Oil Company*, the court found that the patentee's letter,
14 describing the declaratory plaintiff's activities as "fall[ing] within" the patent, did not constitute an
15 allegation of infringement. 970 F.2d at 889. Here, eISA's letter is even less threatening than the one
16 in *Shell*. eISA's letter contains very vague language and merely mentions that the '173 patent "*may*
17 *concern* existing and/or contemplated system decisions that *may relate* but may not be limited to:
18 Electronic Tearsheets, Proof of Ad Delivery Systems, Advertising[.]" (emphasis added). Nowhere does
19 the letter threaten litigation or even insinuate actual infringement by Shoom or its customers.

20 Letters directed to a potential infringer's customers can be relevant in determining whether a
21 reasonable apprehension of litigation exists. *See Arrowhead Industrial Water, Inc.,* 846 F.2d at 737.
22 However, in *Arrowhead*, the patentee's letter specifically referenced Arrowhead, mentioned direct
23 patent infringement, and was directed to a specific customer of the declaratory plaintiff. Here, eISA's
24 letter does not mention Shoom, nor did eISA specifically target Shoom's customers in its mass mailing
25 of the letter. Rather, Shoom customers encompassed only 30 of the estimated 250 recipients of the

---

27 [3]Shoom also explains that prior to July 27, 2005, it was unaware of the existence of eISA's patent, and eISA never delivered a copy of the patent to Shoom. The Court fails to see how these facts weigh on whether Shoom faced a reasonable apprehension of suit at the time it initiated this action. In the same vein, Shoom contends that eISA failed to include the
28 claims of its patent in the letter, thereby further confusing the recipients. Again, the Court fails to see how partial inclusion or omission of the actual patent heightened Shoom's apprehension of suit by eISA.

7

letter.

Furthermore, other factors also illustrate the non-threatening tone of eISA's offer to license. eISA's President signed and endorsed this letter, not eISA's legal council. Also, eISA's letter avoids language that requires urgent action on the part of the recipient. Notably, the letter concludes by stating, "please contact me at your convenience."

Overall, the Court finds that eISA's Judge 2005 letter did not create a reasonable apprehension of litigation among Shoom's customers and did not amount to a direct or implied threat of litigation against Shoom.

Second, Shoom argues that certain statements contained in Mr. Metsig's August 1, 2005 email amount to threats of litigation when viewed under the totality of the circumstances. Specifically, Shoom highlights the following statements: (1) "the patent is what it is"; (2) "[m]y intentions are to work with you, if at all possible..."; and (3) "upon the advice of counsel." Shoom then offers the following explanation of these statements:

> While . . . Metsig, in a vacuum, may not be required to give an assurance of non-infringement, Metsig's statement of Aug. 1, 2005 "[m]y intention are to work with you *if at all possible,* . . ." indicate that Metsig wants to do something, i.e., work with Freschi, and that giving an assurance of nonsuit is not one of them. The term "if at all possible" is a thinly veiled threat of litigation. Metsig has retained counsel, stating "upon the advise of counsel . . ." in his August 1, 2005 email. Metsig's definition of ". . . work with you. . ." meant that Freschi was to pay royalties to [eISA]. In almost every conversation with Metsig, Freschi recalls that Metsig wanted to discuss royalties and how they would be paid.

(Opp. at 10 (citing Freshi Decl. at ¶66).)

When placed in context, the email fails to establish a direct or implied threat. Immediately before Mr. Metsig's August 1 email, Mr. Freschi emailed Mr. Metsig requesting clarification regarding the scope of the '173 patent. In response, Mr. Metsig would not discuss the limits of the patent. However, Mr. Metsig did convey his intentions to work with Mr. Freschi. Thus, Mr. Metsig's response to Mr. Freschi demonstrates that eISA had a willingness to engage in licensing negotiations with Shoom, rather than to immediately file suit.

As detailed above, a patentee's offer to license does not create an actual controversy. *Phillips*, 57 F.3d 1051, 1053 (Fed. Cir. 1995). "A patentee's attempt to conduct license negotiations is a commercial activity." *Id.* at 1054. "When there are proposed or ongoing license negotiations, a litigation

8

1 controversy does not arise until negotiations have broken down." *Id.* Here, Shoom presents no evidence that negotiations failed. After Mr. Metsig's August 1st email, *Shoom* responded critically of Mr. Metsig's hesitation to describe the '173 patent. Nothing suggests that *eISA* stalled or refrained from continuing with negotiations. Shoom thereafter filed suit, but the reasonable apprehension standard "requires more than the nervous state of mind of the possible infringer." *Id.* at 1053-54.

More specifically, the quotations referenced in Shoom's brief cannot be construed as implied threats of litigation. At most, the alleged purposeful phrasing of eISA's email is nothing more than posturing. The Ninth Circuit has recognized that "banter between parties, short of a threat to file a suit or harassing or threatening to harass the trade . . . goes far to undercut the requisites of an actual controversy." *Solenoid Devices, Inc. v. Ledex, Inc.*, 375 F.2d 444, 445 (9th Cir. 1967). Accordingly, the Court finds that Mr. Metsig's August 1st email, coupled with the surrounding circumstances, fails to amount to an implied threat of litigation.

Third, Shoom contends that Mr. Metsig's oral statements to Mr. Freschi amounted to explicit or implicit threats of litigation. Specifically, Shoom proffers that Mr. Metsig made the following statements during discussions with Mr. Freschi: (1) "You can pay me now or you can pay me later"; (2) "We will let the lawyers handle it"; and (3) "The patent applies to everyone who creates electronic invoices newspapers, you are going to pay[.]"

Although Shoom contends that these statements support a finding that eISA's conduct created a reasonable apprehension of litigation necessitating this lawsuit, Mr. Freschi's Declaration fails to specifically identify when Mr. Metsig made these statements. eISA maintains that these statements, if made at all, occurred after Shoom filed this action, and therefore could not give rise to a threat of litigation by eISA. Irrespective of this timing issue, even assuming Mr. Metsig made these statements, none of them amount to a direct threat of litigation. Further, Shoom's failure to establish when these statements were made leaves open the possibility that Mr. Metsig could have made them after Shoom filed this lawsuit or during the parties' confidential settlement negotiations when the parties discussed licensing and royalty rates - none of which could support a finding of a reasonable apprehension of litigation preceding Shoom's filing of this action.

Other factors also illustrate that Shoom did not have a reasonable apprehension of litigation.

9

1  Courts may consider a patent holder's willingness and capacity to engage in litigation to enforce patent
2  rights. *Arrowhead*, 846 F.2d at 737.  Also, courts have considered whether the patent holder previously
3  filed any actions against the declaratory plaintiff. *See C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 879-82
4  (Fed. Cir. 1983) (finding that in the past, patent holder filed suit in state court to enforce rights under
5  license agreement between itself and declaratory Shoom).  Shoom fails to demonstrate that eISA ever
6  filed any patent litigation prior to August 24, 2005 to enforce *any* patents, not just the '173 patent.
7  Additionally, Shoom's August 22, 2005 intra-office memo acknowledges that eISA "may flame out
8  unless they strong arm some royalties from the industry."  (Doc. #33, Ex. #14.)  Thus, the evidence
9  appears to show that Shoom did not even subjectively believe eISA would file suit because eISA did
10 not demonstrate a marked willingness and capacity to engage in patent infringement litigation.

11         When viewed in totality, the circumstances in this case are markedly different from those that
12 supported jurisdiction under the Declaratory Judgment Act in *Arrowhead.*  Particularly, in that case, the
13 Federal Circuit found that the Ecolochem's letter to Arrowhead "stated Ecolochem's express intent to
14 enforce its patent rights by litigation"; Ecolochem's lawsuit against another party "evinced not only an
15 intent but a willingness and capacity to employ litigation in pursuit of its patent rights"; and
16 Ecolochem's request that the court find that Arrowhead was infringing on its patent, thereby
17 demonstrating Ecolochem's belief that Arrowhead's process was an infringement on Ecolochem's
18 patent, all of which combined to establish that Ecolochem's conduct created a reasonable apprehension
19 on the part of Arrowhead that Ecolochem would sue if Arrowhead continued its activity. *Arrowhead*,
20 846 F.2d at 737. Here, in contrast, eISA's acts preceding the initiation of this lawsuit do not compel the
21 same conclusion.  eISA's form letter and Mr. Metsig's emails and statements do not demonstrate an
22 express, or even implied intent to file an infringement action against Shoom or any of its customers.
23 Additionally, there is no evidence that eISA has been aggressively filing infringement suits to enforce
24 its patent.  Finally, there is no evidence that eISA had determined that Shoom's electronic invoices
25 infringe on its patent.  In light of the foregoing, the Court finds that Shoom has failed to meet its burden
26 of demonstrating that eISA's conduct created a reasonable apprehension that it would initiate an
27 infringement action against Shoom or its customers if they continued to use Shoom's electronic
28 invoices.  The Court therefore finds that no actual controversy exists to support subject matter

jurisdiction over this action under the Declaratory Judgment Act.

**IV.     Conclusion**

For the foregoing reasons, the Court **GRANTS** eISA's Motion to Dismiss (Doc. #27).

**IT IS SO ORDERED.**

Dated: 5/31/2006

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE